[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S RELOCATION MOTION AND PLAINTIFF'S MOTION FOR MODIFICATION OF CUSTODY
This matter is a post-judgment proceeding. The gravamen of the proceeding is twofold:
a. the defendant mother wishes to relocate to Marblehead, Massachusetts and take the two minor males, issue of the marriage, with her, and
b. the plaintiff father seeks to change the order of custody from joint custody with no designation of primary physical custodian to joint CT Page 12728 custody with the him designated as the primary physical custodian.[1]
The plaintiff mother asserts her right to relocate in Light of the directions issued in Ireland v. Ireland, 246 Conn. 413 (1998). TheIreland court answered many long debated positions on the rights of parents to relocate and take the minor children with them to the new location. The court dictated that relocation would be allowed in certain defined circumstances.[2]
 I.
The parties to this action married in August of 1987.[3] They were from drastically different economic strata and there was a prenuptial agreement concerning the defendant's entitlements in the event of dissolution.
On February 17, 1989, as a result of a planned pregnancy, John was born. There is no doubt that the defendant was the primary caregiver during the early stages of John's life. According to the defendant, John experienced normal developmental milestones and started nursery school at age three. The plaintiff had very little contact with the nursery school, probably because he was busily engaged in a demanding business setting.
On December 9, 1993, again as a result of a planned pregnancy, Christopher was born to the marriage. There is no doubt that the defendant was the primary caregiver during the early stages of Christopher's life. Christopher progressed through infancy and toddlerhood with normal developmental milestones.
It is obvious from the evidence that the plaintiff was involved in the children's lives during the early years on a limited schedule. However, there was no evidence to suggest that there was any lack of quality involved in the care provided the children by the plaintiff. It is, and should be, undisputed that the defendant was the primary caregiver in the early lives of the children.
In July or August 1995, the defendant met and began a social relationship with a man she met while he was working on the electrical system of one of the homes occupied by the parties. In the fall of 1995 she chose to escalate that relationship to an extramarital sexual affair. According to the very credible evidence of the housekeeper for the parties, Milagros Perez, the defendant was regularly out of the home in the evenings and stayed out, without explanation, overnight on multiple occasions when the plaintiff was traveling, leaving the children in the care of Ms. Perez. The defendant repeatedly asked Ms. Perez to lie CT Page 12729 to the plaintiff about her absences.
Also in 1995, it was determined that John was having school/learning issues which were not being resolved by normal teaching methods. John was psychologically evaluated and seen by a speech therapist.
The parties divorced in May 1997 and the court incorporated a separation agreement dated May 21, 1997 in its judgment.
The agreement/judgment included the following:
 "4.12(a) Either party shall have the right, without restriction and upon at least thirty (30) days written notice to the other party' to move his or her principal residence to a principal residence located within a reasonable distance from Greenwich, Connecticut (defined as not more than fifteen (15) miles from the borders of Greenwich, as measured by automobile travel, and, for this purpose, anywhere in the Town of Bedford, New York shall be deemed a reasonable distance from Greenwich, Connecticut) (the `Permitted Area'). As used in this Paragraph 4.12, the term "principal residence" shall be deemed to mean any residence where the children are to reside with a party for a period of more than thirty (30) days, in any consecutive twelve (12) month period, except for vacation or summer periods."
In the late summer of 1997, the defendant moved, permissively, her residence ("principal residence" as defined in the agreement) to Bedford, New York.
In what was obviously a significantly negotiated area of the agreement/judgment,[4] the parties entered a detailed custody/visitation system. There was a suggestion by the plaintiff that the restrictive nature of the relocation language and the breadth of the co-parenting arrangement were in part the result/cause of an enhanced financial package for the defendant. The position seems to be asserted under some contractual theory that the "consideration", offered and paid, limited the defendant's right to seek changes in the residential arrangement for the children. This court considered and rejects any argument that the defendant's claim cannot be considered because the non-relocation language was "bought and paid for." The issue before the court is the best interests of the children. Connecticut GeneralStatutes. Section 46b-56. A change in circumstances concerning the children's welfare can ALWAYS be brought before the court while a CT Page 12730 reallocation of property cannot be sought or granted. This court will not entertain a concept that money exchanged between the adults will be the controlling factor in determining the welfare of the minor children.
While the entire co-parenting schedule issue is important, for purposes of this fact finding and decision making, the crucial agreement appears in Article IV, Paragraph 4.1(b):
 "The children will reside with each of the parties in accordance with the following schedule which shall be repeated every two weeks as follows (sic):
 WEEK 1: Mon-Thurs (Wife), Fri-Sun (Husband) WEEK 2: Mon-Thurs (Husband), Fri-Sun (Wife)"
In other words, the parties agreed to a 50/50 share of time for residential custody of the children. As noted in paragraphs 4.10 and 4.11 of the Separation Agreement, the parties also agreed to alternate custodial decision making within day to day affairs but opted to leave the custodial decision making on major issues undefined.
Thus, it is a clear that neither the parties, nor the court acting in compliance with the agreement of the parties, ever defined "primary physical custody".
Though evidence was scant, it appears that the envisioned 50/50 probably did not really occur until 1999. Apparently, the defendant, from the time of the divorce forward, gradually "moved" the schedule to every other weekend with the plaintiff and one evening during the week with the plaintiff. This seemingly occurred because the plaintiff regularly had to amend the schedule to accommodate his business demands. It may also be that the children found the frequent "alternation" somewhat difficult, primarily because it was unreliable.
In the fall of 1997, John exhibited an extreme case of separation anxiety concerning school attendance. Prior to this time he had been an anxious child and his anxiety seemed to be worsening. At various times before and after this onset, it became known that John suffered from significant learning disorders. It is now well defined that John is dyslexic and has other general language based learning disorders. John attended Brunswick, a highly competitive private school for a period of time. Early in the 1997-1998 school year John exhibited significant anxiety issues associated with attending Brunswick.
In late fall/early winter, John's anxiety difficulties meant he could no longer "handle" a full day at school. It was realized by both parents CT Page 12731 and the school professionals that his learning issues would not allow him to succeed in such an educational setting.
At the about the same time, fall of 1997, John began to show anxiety issues surrounding the time spent at his father's home. Mother perceived this as resulting from the fact that there was always great uncertainty about schedule, since father's schedule could change unexpectedly. In other words, the children seemed to be witnessed by the confusion of when they would and would not visit Dad. Christopher showed reluctance to visit with his father because John was not going to visit.
Around this time the parties and John went to see a family counselor. It was decided to "change" the visitation schedule to every other weekend and one evening a week with the plaintiff. The apparent goal was to provide predictability and stability for the children.
There was no evidence suggesting that the change in visitation scheduling and planning had a significant positive effect on the psychological and/or educational well being of the children. At best, the change seemed to make the defendant's life more predictable and allowed for attention to her needs in a slightly more flexible manner.
In fact, John's problems at school, which all have a serious psychological overlay, seemed to exacerbate. John was very resistant to entering school. If he could be persuaded or cajoled to enter the building, the defendant had to remain physically present, often in the car in the parking lot. This separation anxiety reached the heights where the defendant had to allow John to keep her keys in his shoe so he knew she could not leave. Full day school attendance was the exception rather than the norm.
After a search and difficult decision making, the parties decided to send John to the Eagle Hill School. This school has a reputation as an excellent school for children with learning challenges.
Throughout the 1998-1999 school year John struggled, with very little success, with the anxiety, learning and separation issues. It took Herculean efforts by the defendant and the school authorities to try and cope with the multifaceted difficulties John was experiencing. In fact, the defendant had to spend almost full time in the school setting to enable ANY attendance at class. It is absolutely clear that the defendant devoted her life to the needs of John.
During the summer of 1998, the current spouse of the defendant, Justin Scott, appears on the "family scene." The evidence is that the parties met in early 1998 and the relationship grew during the ensuing months. By CT Page 12732 the time of the summer, Mr. Scott was spending blocks of time in the summer home with the defendant and the children.
During the 1998-1999 school year, John had gradual improvement in some of his psychological issues and the separation issues were less intrusive on the learning process. It is noted, however, that the defendant still had to spend almost all of her time at the school in order to keep John's comfort level high enough for attendance and partial participation.
In December 1998 or January 1999, Justin Scott indicated his desire to marry the defendant. The initial "proposal" occurred at this time. By her own testimony, the defendant started research on relocation to Marblehead, MA in January 1999. Some time in February or March 1999, the defendant raised a possible relocation with the plaintiff for the first time. Showing a lack of good judgment, the defendant discussed the relocation issue with the children around this period of time. With children already suffering anxiety issues because of lack of certainty and predictability in their lives, inserting a "possibility" that a court might or might not allow such a relocation does raise questions about mature judgement capacity. Forcing the children to go through the inevitable processing of "what happens to me if I move", "gee, will I still be able to see my friends", "wow, it's scary to have to start in a new school where I won't know any of the guys", etc., when the outcome is so unpredictable clearly creates a smog over the motivations involved; are the real issues the welfare of the children or MORE IMPORTANTLY the defendant's egocentric needs to "plant seeds" with the hope that the "seeds" will blossom to statements of preference by the children.
In June of 1999, the defendant married Justin Scott. She invited the plaintiff to the wedding but he declined the opportunity. The children did attend the wedding.
Mr. Scott is permanently here as a green-card resident alien. He is employed as the Chief Investment Officer for Putnam Investments, a Boston, Massachusetts firm. He is employed pursuant to an employment contract. He is a significant earner and is, obviously, a very desirable asset for financial entities.
Mr. Scott, by all available evidence, is a positive force in the life of the Camuto boys. Most importantly, he recognizes his role and is conscientious about not interfering in the father/son(s) relationship.
It is noteworthy that Mr. Scott knew of the restrictive covenant in the relocation language of the parties' Separation Agreement before the marriage. In fact, according to his recollection, he may have been present when this matter was discussed with Attorney Sarah Oldham before CT Page 12733 the marriage. It is also admitted that he bought the home he proposes to live in, in Marblehead, AFTER being aware of the agreement but before knowing the outcome of this court action. According to the very credible testimony of Mr. Scott, he knew full well that the plaintiff was opposed to a relocation. Thus, at least on the grounds of hardship, Mr. Scott does not have much to complain about as to any outcome here.
Mr. Scott testified that he did not believe he could reasonably relocate his employment situation outside of the Boston area. He, nor the defendant, provided ANY independent evidence to support this assertion. Incredibly, Mr. Scott also testified that he had never explored the possibility of telecommuting with his current employer. This is patently a question a court has a right to expect answered in the year 2000, and beyond, by parties seeking to eliminate or curtail parental contact because of claimed employment/relocation difficulty.
Again indicating a judgment problem and the inability to evaluate the potential relocation in light of the best interests of the children, the defendant asserts that the plaintiff can "live" in the new guest house in Marblehead when he wants to see the children.
In June of 1999, the plaintiff father, entered a business arrangement which allowed him to retire. According to his testimony, this arrangement allowed him to engage in consulting to his former company without being at the beck and call of the corporate needs. He was no longer the person ultimately responsible for corporate affairs. He no longer was required to "answer" the travel demands of the business success. He assumed control of his daily schedule and basically eliminated those demands to the extent they did or might interfere with the needs of his sons.
Still troubled by the progress/lack of progress shown by John, in September of 1999 the plaintiff exercised his rights under the Separation Agreement and insisted that the 50/50 system would go back into effect.[5] This plan of the plaintiffs was unannounced and notice was given to the defendant by plaintiff keeping the children beyond the scheduled time and delivering a letter to the defendant. (Defendant's Exhibit 14.) While there were clearly disagreements and problems with the plaintiff's unilateral action, the defendant allowed the system to work. It is fortunate that she chose to adopt this approach, since it has so clearly worked in favor of the boys.
The defendant asserts, but offers no supportive evidence, that the plaintiff's "sudden" change to the 50/50 system resulted in a resurfacing or exacerbation of John's anxiety issues. In fact, the evidence concerning the 1999-2000 school year belies this assertion.
CT Page 12734 As Family Services Officer (now known as some titled within the nebula of CSSD), Karen Kutno,[6] opined, the decision by the plaintiff, imposing unilateral action while the court action and its attendant studies were in progress, leaves much to be desired. Despite this court's obvious preference for exact compliance with orders and lack of changes in a situation involving children already exhibiting anxiety issues fostered by their insecurity, based on "not knowing which parent will do what next", the fact is that the decision has turned out to be revealing.
All available evidence reveals that John thrived in the 1999/2000 school year. While there was still full and appropriate input from the defendant, there is no indication that this input was drastically different from that of any other parent of a learning disabled child. In other words, there was a drastic change; mother no longer had to use Herculean efforts to allow John to exist in the school setting. One cannot help but speculate that the "new" 50/50 let John recover to the point of needing special and skilled attention but no longer requiring attention which cannot be allowed to be a demand if John is to thrive in the world available to him.
When all the rhetoric and attempts to shade information for persuasion are swept away, the net finding is that the children are much better off under the 5 0/50 than they were when the plaintiff was limited to one night per week and every other weekend.
 II
The Ireland decision is not "on all fours' with the instant case. InIreland the trial court had previously awarded joint custody with primary physical custody with the mother. Ireland at 415. In this matter, there was no definition agreed to by the parties, or ordered by the dissolution court, for "primary physical custody." The parties agreed to ". . . share joint legal and physical custody of their minor children, John "Vincent Camuto and Christopher Camuto." (Separation Agreement Art. IV, 4.1.) Thus, the dissolution court, by approving the agreement of the parties and incorporating that agreement, by reference, in its judgement, ordered NO particular primary physical custodian.
Despite the lack of exact symmetry, this court believes the wisdom and dictates of Ireland are still appropriate for disposition of this relocation matter.[7]
The Ireland court, dealing with a case where the primary physical custody had been committed to the plaintiff mother, directed that future trial courts evaluate relocation issues by assessing the following:[8]
CT Page 12735
 "[E]ach parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements . . . the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships." See Ireland, supra at 432 citing with directional favor Tropea v. Tropea, 87 N.Y.2d 727, 740-741 (1996).
Being aware of the Ireland precedent and one trial court's subsequent examination of the precedent in a matter very similar to the instant case,[9] this court decided after early testimony that it was not appropriate to leave the "primary custodian" issue aside. Even though tempted otherwise, it was decided to position the case so the Ireland
burden shifting could be applied; this is in direct conflict with the learned decision of the well respected Judge Gruendel in the Stanford
case cited, infra. Thus, the decision was not lightly made and is, in the mind of this court, very FACT specific to this matter.
The Ireland system is found at page 428:
 ". . . we hold, therefore, that a custodial parent seeking permission to relocate bears the initial burden of demonstrating, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, and (2) the proposed location is reasonable in light of that purpose. Once the custodial parent has made such a prima facie showing, the burden shifts to the noncustodial parent to prove, by a preponderance of the evidence, that the relocation would not be in the best interests of the child."
Using the infancy, toddlerhood and pre-June 1999 relationships, this court credited the defendant as the "primary physical custodian" for purposes of the analysis. Applying the facts to the instant matter, the court found that the defendant met her burden to establish that the move CT Page 12736 was sought for legitimate purpose. The purpose, as alleged and proven, is that she has remarried and started another intact family in which she and the new partner would be more completely accommodated by the move.
The purpose of the move, as recited, is met by the proposed move. In other words, it is found that the action was initiated and-pursued within the threshold Ireland criteria.[10]
Once the defendant met her threshold burden, the Ireland shift moved the burden to the plaintiff. In this matter, the plaintiff has accepted and met his burden of proof by a preponderance of the evidence that the proposed move would not be in the best interests of the children.[11] In fact, the plaintiff has, at least as to John, proven that the proposed move would be injurious to his health and welfare.
All of the available professional evidence boils over in favor of leaving John in the current educational environment, with the current psychological treatment, moving through the education and growth process as envisioned and in a situation where his father will be a significant force in his daily life. Each of the professionals provided very convincing testimony that the move is not in the best interests of the children. The psychological professionals uniformly cautioned that a move could have significant negative consequences on John's fragile year and one-half of major recovery. The educational professionals convincingly opined that a change in educational setting would be difficult, at best, for John.
It is important to note, though most of the testimony concerned the boy John, there was testimony that Chris will face many of the same or similar learning problems. It is clear that he can be expected to need special education attention and that the familiarity of the people at Eagle Hill with family and its history could inure to his benefit.
An assessment of the parties' motives in seeking or opposing the relocation is resolved in favor of the defendant; there is a legitimate reason for the request and the suggested relocation achieves that reason. The plaintiff's reasons for opposing the move are also legitimate. The relationships between the children and the parents can be maintained if the defendant chooses to change her relocation plans or by her ability to maintain two households and commute. She has both the time and the wealth to accomplish this without interfering with the children's need to stay here for educational and mental health reasons.
The wealth of these parties is of a magnitude that neither one is imposed upon by the obligations to accommodate the maximum welfare of the children. The defendant's wealth, as a result of the dissolution, may be CT Page 12737 expanded by the new union but there is no reason to believe this is necessary or will not occur absent the relocation. (The defendant has repeatedly asserted her intention to abandon the relocation if not approved by the court. However, that assertion is not legally binding and may find the same fate as the defendant's repeated assertions that recommendations against the relocation by the professionals would mean she abandoned the relocation. Every testifying professional, psychological, educational and legal recommended against the relocation.) There was no evidence offered that there would be economic benefit to the children as a result of the relocation.
As noted above, there was convincing evidence that the relocation could be harmful to the educational and emotional welfare of the children. Amazingly, there was not even an attempt to offer evidence that the educational and emotional welfare of the children would be improved by the relocation.
There is no reason there should be a negative impact of this decision on either parent/child relationship. These parties are demonstrably capable of devoting themselves to the children.
The existing extended family relationships have all been developed with the existing location of the children. There was no evidence provided that Mr. Scott will bring any new dimensions to those relationships if allowed to relocate. There was clear evidence that there is a relationship between the boys and their paternal half-siblings. There is no evidence, or common sense evaluation, offered that these could would be maintained after relocation. Importantly, there was no evidence offered that the maternal extended family relationships will be lost or impeded by a denial of relocation.
It is noteworthy that the defendant, when asked to comment on the pros and cons of the relocation, commented very clearly on the expansion of maternal relationships but never thought about the potential loss or impairment of the paternal familial relationships.
The final assessment is that of the court having absorbed the entire panoply of personalities, demeanors and testimony; in other words, the aura of the case.
The children in this matter are distressed and can be assisted in their struggle to deal with the burdens life has given them with the real commitment and availability of devoted time and energy available from the plaintiff father. He serves as a significant leveling factor on the oftentimes immature judgments exhibited by the defendant mother. His wisdom and guidance must be fostered, not impeded by separation. CT Page 12738
 ORDER
In essence, the defendant's request/motion is for a modification of the judgment. To the extent that the request allows the relocation of the children to Marblehead, Massachusetts, it is denied.[12]
The plaintiff, by way of objection, motion and claims for relief asserts right to modification. It is granted in the following ways:
1. The parties shall share legal custody of the minor children. Primary physical custody, subject to the below defined residential orders, shall be with the plaintiff, father.
2. The children will reside with each of the parties in accordance with the following schedule which shall be repeated every other week as follows:
 WEEK 1: Mon-Thurs (Wife), Fri-Sun (Husband) WEEK 2: Mon-Thurs (Husband), Fri-Sun (Wife).
3. The party with whom the children are residing shall be solely responsible for all transportation during the period of residence. The change in transportation responsibility will occur when the party about to assume residential responsibility picks up the children after school on Friday.
4. At the conclusion of any vacation period of residential responsibility, the party with residential responsibility will return the children to the opening of the first day back at school. At the commencement of any period of residential responsibility, the party who will be assuming residential responsibility for the vacation period will pick the children up at school.
5. To the extent that school is scheduled to be in session, the party with residential responsibility shall maintain the children at the "principal residence", as defined in Article IV, 4.12(a). Should the parent with residential responsibility not be available to reside with the children, at said "principal residence", that party will cede residential responsibility to the other party for the period involved.
6. Should the parties, after good faith negotiation, not be able to resolve issues of health, education and/or welfare of the children, the plaintiff shall make the final decision.
CT Page 12739 Any claim for attorney's fees is to be submitted, with attached supporting attorney's affidavit and party's sworn financial affidavit, on or before November 9, 2000. The submission is to include a chambers copy addressed to the undersigned.
DANIEL E. BRENNAN, JR., JUDGE